## JOHN LAWRENCE v. THE STATE.

No. 11902.  Delivered June 13, 1928.
Rehearing denied May 29, 1929.

The opinion states the case.

*John J. Fagan, Jed C. Adams* and *Robert B. Allen, Sr.,* of Dallas, for appellant.

*William McCraw*, District Attorney of Dallas County; *Andrew J. Priest*, Assistant District Attorney of Dallas County; *Arch C. Allen*, Special Prosecutor of Dallas and *A. A. Dawson* of Canton, State's Attorney, for the State.

MARTIN, JUDGE.—Offense, murder; penalty, fifty years.

Antecedent ill feelings existed between appellant and deceased, Jack Kimbell, due to the alleged intimate relations existing between appellant and the wife of deceased. On the day of the tragedy a difficulty ensued between deceased and his two brothers on one side and appellant on the other in which appellant was severely beaten and bruised. Going immediately to his place of business a short distance away after this difficulty, appellant returned at once with a rifle and shot and killed deceased.

Appellant claims he was struck by deceased on the head with brass knucks during the difficulty above mentioned, which raised an issue of the presumption arising from the use of a deadly weapon by deceased under Art. 1223, P. C. The refusal of a special charge properly presenting this matter is assigned as error. The language of Art. 1223 is as follows:

"When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapon or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

This is part of the law of justifiable homicide in Texas, and the language "when the homicide takes place to prevent murder * * * if the weapon or means used by the party attempting or committing such murder," etc., evidences plainly that the weapon must be actually *used* or attempted to be used in some way and that the homicide took place to prevent its use or attempted use.

The evidence shows the appellant after his return with a rifle stood at a distance of about 80 feet from deceased and shot him, and there was no testimony that deceased was then using or attempting to use brass knucks or that appellant thought he was, and shot to prevent such use or threatened use. On the other hand appellant testified:

"When I raised the gun to stop them they scattered. Jack ran to my left and the others to my right. * * * I had very much fear of being shot from this direction and also from that direction. * * *

When he (deceased) came out from behind the automobile he just started on the sidewalk. * * * There were iron columns and brick columns in front of the building. * * * If Jack Kimbell had gotten behind a column over there I could not have protected myself at all from both sides."

This is sufficient to show he feared being shot and that he had no reasonable grounds for a fear at the time of death or serious bodily injury from the use or threatened use of brass knucks.

A discussion of the place Art. 1223, P. C., occupies in the law of self-defense will be found in the recent case of Forrester v. State, 4 S. W. (2d) 966, the reasoning of which will illustrate in some measure the issue in this case. The cases of Jones v. State, 17 Tex. Crim. App. 612; Kendall v. State, 8 Tex. Crim. App. 569; Cooper v. State, 48 Tex. Crim. Rep. 36; Hudson v. State, 59 Tex. Crim. Rep. 650, in their reasoning and statement of the rule of law on the question under discussion sustain our holding, we think, that the trial court's action in the instant case was correct.

The deceased filed a damage suit against appellant for alienation of his wife's affections a short time before the tragedy, and had citation served upon him. Copy of this citation so served was introduced by the State in evidence to show motive and its purpose was so limited in the Court's charge. Many objections were urged to its introduction, particularly that it was res inter alios acta. This citation among other things charges appellant with corrupting his wife, causing her to sue deceased for divorce, and of alienating her affections for deceased. The bill of exception presenting this matter must be appraised in its relation to the entire record. There are some apparent differences in the authorities on this question, due perhaps to differences in the proven facts to which such a question relates.

Mr. Underhill says:

"The papers in a prior litigation, civil or criminal, instigated by the deceased against the accused or in which he was a witness * * * are admissible against the accused to show motive." Underhill's Criminal Evidence, Third Edition, Sec. 503, p. 719.

The papers in an injunction proceeding were held admissible in the case of Turner v. State, 33 Tex. Crim. Rep. 110. See also Hudson v. State, 28 Tex. Crim. App. 340; Robinson v. State, 16 Tex. Crim. App. 354.

On the other hand, we find the following language in the case of Pinckord v. State, 13 Tex. Crim. App. 478:

"All the proceedings, including the petition, judgment, etc., in a suit wherein defendant's wife had sued and obtained a decree of divorce from him were read by the prosecution in evidence to the jury. As a fact tending to show the feelings and relations of the parties to each other, it was doubtless legitimate to prove that the wife had instituted suit for a divorce prior to, and that the same was pending at, the time it was alleged the crime charged against defendant was committed. But it was error to permit the allegations of her petition for divorce to be read and go as evidence to the jury, and especially so without any explanation or instruction as to how far and for what purpose they were alone to be considered."

There was apparently no issue upon which the entire divorce proceedings were admissible in this case.

One of the State's theories was in this case that appellant killed Jack Kimbell because he didn't want to meet deceased on the issues shown in this citation in a public trial, and to rid himself both of the trial and the danger of a judgment he seized the opportunity to kill deceased; that as evidence of this one of deceased's brothers was the real aggressor, but appellant took his gun off the brother whom he had no motive to kill and shot deceased as he ran away from him. There was also much testimony offered without objection of improper relations between the wife of deceased and appellant. It was proven and admitted as true by appellant that the two were caught alone in a hotel room together in the City of Dallas registered under the name of J. Stevens and wife. The damage suit followed this hotel episode.

The allegations contained in such a suit are naturally of a character that they should not be admitted unless it clearly appears they tend to help solve some issue and not even then without some limitation, if requested, of their use as evidence by the jury.

In this case the Court instructed the jury as follows:

"Now, I instruct you that said citation and the statements and allegations therein contained is no evidence of the truth of said statements or allegations, and I instruct you that if you consider said evidence, for any purpose at all, you will only consider it for the purpose of aiding you, if it does aid you, in determining the motive, if any, with which the defendant acted at the time the said Jack Kimbell was killed, if he was, and for no other purpose."

In view of the State's theory and evidence as to motive and the above charge and measured in its relation to the entire record, we

do not believe the bill of exception presenting this matter shows error.

Complaint is made of the charge quoted above limiting the use of the citation as evidence by the jury. The claim is made that same is on the weight of the evidence. The Court qualifies appellant's bill presenting this matter with the statement that defendant in his exception to the Court's charge stated that said testimony should be limited in the charge. We do not think the charge is upon the weight of the evidence. The charge in the instant case, we think, is clearly distinguishable from those found in the cases of Terry v. State, 45 Tex. Crim. Rep. 272; Pannell v. State, 54 Tex. Crim. Rep. 499; and Yancey Story v. State, 107 Tex. Crim. Rep. 266, which are cited by appellant as sustaining his views. Apparently the appellant had asked for a limitation of this evidence and it was limited by the Court specifically to proof of motive, although it also may have tended to show malice. This omission, however, was not prejudicial to the appellant.

It ordinarily is not necessary to limit testimony which goes to prove a main issue in the case. Leeper v. State, 29 Tex. Crim. Rep. 69; Branch's P. C., Sec. 1885. But where it may be wrongfully appropriated by the jury to prove guilt it is always best especially when requested to limit it in such way as to prevent its wrongful use by the jury. Kelley v. State, 18 Tex. Crim. App. 269; Branch's P. C., p. 120.

Bills of exception appear in the record relating to the conduct and questions of the District Attorney in asking character witnesses what they had heard about the affair between appellant and Mrs. Jack Kimbell and other matters of a kindred nature, some of which occurred after the District Attorney had been warned by the Court to not ask any further questions along that line. Without going into detail, suffice it to say that we think some of the conduct of the District Attorney was improper but these matters cannot be isolated and detached from all their surroundings and measured to determine whether or not injury has been done to the rights of appellant. There were admitted facts in the record concerning the relations between appellant and the wife of deceased of much more prejudicial character than any of the remarks which the District Attorney made. In each instance the Court instructed the jury to disregard such remarks and conduct. The jury having before it from the mouths of witnesses and appellant himself facts which tended very strongly to suggest such an intimacy, we fail to see why questions relating to

such a matter, which the jury were specifically instructed to disregard, could constitute such injury as would demand a reversal. We deem it useless to cite authorities as all such matters must be determined from their own particular surroundings. The District Attorney did not inject into the case a prejudicial matter, it was already in the case. He merely improperly referred to an issue that was hotly contested. If evidence of intimacy was totally absent, we can see good reason for reversing because of the improper references of the District Attorney, but in this case there exists an admission by appellant of his presence alone in a hotel room with deceased's wife, registered under an assumed name. With this and other facts before the jury, we are of the opinion that such references were not of that character which demand a reversal and especially in view of the Court's instructions with reference to same.

We have examined all of appellant's bills of exception and finding no error in any of them, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In his motion for rehearing appellant urges all the points originally relied on for a reversal, many of which were not briefed or discussed. This has necessitated a careful scrutiny of all bills of exception found in the record and also a close re-examination of the facts.

Bills 12, 13, 15, 16, 18, 19, 20 and 21 when considered in the light of the entire record or in connection with the court's explanation appended to such bills fail to exhibit error. A discussion of none of these bills seems demanded.

Appellant again urges that the trial court committed error as shown by bill of exception number six in permitting the state to introduce in evidence the citation which had been served upon appellant in the suit brought against him by deceased for $50,000.00 damages for alienation of the affections of his wife. We entertain no doubt of its admissibility. In Turner v. State, 33 Tex. Cr. R. 103, cited in our original opinion, Judge Davidson, speaking for the court, said:

"The petition for writ of injunction filed by deceased against defendant Vinson and others in regard to the cattle set out therein,

the order of the judge granting said writ, and the writ itself, were properly admitted. It was relevant testimony, and bore directly upon the status of the parties to the unfortunate homicide in regard to their animus and ill will towards each other."

Appellant renews complaint (Bill No. 17) of the instruction given limiting the purpose for which the citation could be considered by the jury claiming it to be upon the weight of the evidence. It is not necessary to here copy the charge so criticized as it is set out in our original opinion. It was recognized in such opinion that ordinarily the court is not called upon to limit testimony which goes to prove one of the main issues in the case. It may be further stated that the court should not undertake to limit such testimony unless there is danger of the jury appropriating it to an improper use. We are not called upon under the present record to discuss the general principles above stated. It seems to have been agreed by all parties that the use by the jury of the citation should be limited by the court. In his exception to the charge appellant says:

" * * * in limiting and attempting to control the purpose for which the jury might consider the citation in the civil damage suit, the court charged upon the weight of the evidence, in that it specifically tells the jury that they may consider said testimony in determining the defendant's motive. *The defendant says that said testimony should be limited in the charge, but that limitation placed upon it by the court is a charge upon the weight of the evidence and is an improper one.*"

In form the charge complained of is not subject to the objection as were the instructions condemned in Terry v. State, 45 Tex. Cr. R. 272, and Pannell v. State, 54 Tex. Cr. R. 499. In those cases, as well as in many others, will be found expressions to the effect that ordinarily it is not necessary nor proper for the court to limit evidence on the issue of motive or malice, and in the two cases mentioned the court had before it charges which were objectionable in form. In his brief appellant says the court should have stopped after instructing the jury that the statements and allegations contained in the citation were no evidence of the truth of said statements and allegations, and that in going further the court singled out a particular piece of evidence damaging to appellant and gave it prominence and unduly emphasized it. The trial court was not given the benefit of these suggestions in the exception presented, the objection being only that the charge advised the jury that they might consider said testimony in determining appellant's motive.

In our judgment this exception directed the trial court's attention to the form of the charge which he had given rather than called attention to a complaint for singling out a particular piece of evidence as bearing upon motive. Unless this court should hold that under no circumstances would it ever be proper for the trial court to limit testimony to the question of motive, we would scarcely be justified in condemning the charge complained of. In Roquemore v. State, 54 Tex. Cr. R. 592, 114 S. W. 140, the charge given on the subject was held improper but it was there said to be the province of the court to direct the jury that they could consider the previous conduct of appellant as far as it might have thrown light on the motive and intent of the accused at the time of the fatal encounter. We do not regard such opinion as varying from the general rule that such instruction is unnecessary, but as recognizing an exception to the general rule under certain circumstances.

Complaint is made in bill of exception fourteen that the district attorney on cross-examination of P. K. Irwin asked if he did not know that as deceased "fell in his life's blood, almost his last words were 'He broke up my home.' " This witness was not in Mesquite at the time of the killing but in Dallas and of course could not have known of the statement except through hearsay. The question should not have been asked of this witness. The court properly sustained objection to it and instructed the jury to disregard it. It was in evidence from a number of witnesses without objection that immediately after deceased was shot he said in substance that appellant had broken up his home and then killed him in cold blood, or as some say "shot him in the back." Under the circumstances the improper question to the witness named does not present reversible error.

Bills of exception 9, 10 and 23 complain of questions propounded by the district attorney on cross-examination of some of appellant's character witnesses who had testified to his good reputation. These questions were with reference to whether the witness knew or had heard of improper relations between appellant and deceased's wife, or of the suit which deceased had brought against appellant for alienation of the affections of deceased's wife. Objections to these questions were sustained. However, appellant reserved exception to propounding them for various reasons, one being that they would lead the jury to believe that appellant had in fact been engaged in illicit relations with deceased's wife. The questions did not inject into the case by suggestion an issue not already there. Appellant had placed his general reputation in issue by filing application for

suspended sentence and also directly by calling witnesses to testify to his good reputation. The jury knew that deceased's wife had sued him for divorce and that in consultation with her attorney appellant's name had been connected with the matter, which fact appellant also knew. The jury also knew that appellant had registered himself and deceased's wife at a hotel in Dallas as husband and wife under assumed names, and that deceased had seen them in the room at said hotel; the jury also knew that following this episode appellant had been sued by deceased for damages for alienating the affections of his wife, which suit was pending at the time of the killing. The presense of appellant at the hotel with deceased's wife was explained by him as purely a business appointment, the truth of which was for the jury. It also was in evidence that deceased had received through the mail a letter grossly worded advising him that appellant was having improper relations with deceased's wife. Appellant also knew of this letter because both deceased and his brother had talked to him about it. Appellant claimed that deceased himself wrote the letter. Whatever may have been its source, appellant knew it had become the subject of conversation in the town of Mesquite. He says, in his own testimony: "After Jack (deceased) got that letter I heard about it over town, there must be six or seven he showed the note to. * * * His showing that around created gossip and talk in the town." Under the circumstances it was not unnatural for state's counsel to inquire if appellant's character witnesses had heard this "gossip and talk." The questions propounded on cross-examination to the witnesses named in the bills may have been improper in form and substance but we can not in view of all facts before the jury hold that the questions themselves call for a reversal.

In the motion for rehearing reference is made to bills of exception 7 and 8, but we fail to find such bills either by number or substance in the transcript.

The motion for rehearing is overruled.

*Overruled.*

### DISSENTING OPINION.

#### ON MOTION FOR REHEARING.

The appellant resided at the town of Mesquite, where he was president of a bank. The deceased, Jack Kimbell, his father, J. A. Kimbell, and the two brothers of the deceased (Charlie and Oscar Kimbell) were residents of the neighborhood and customers of the appellant's bank. J. A. Kimbell, father of the deceased, was indebted

to the bank in the sum of $55.00 evidenced by a note, the payment of which it seems that Charlie Kimbell had assumed. Notice of the maturity of the note and request for its payment were mailed in a letter addressed to J. A. Kimbell but fell into the hands of Jack Kimbell, whose initials were the same as those of his father. On the evening of the day that the notice was received the appellant was approached by the three sons of J. A. Kimbell. The subject of the demand for payment of the note was opened by Charlie Kimbell. An altercation (first by words and later by coming to blows) took place in which the appellant was knocked down by Jack Kimbell and received a blow on his forehead producing a wound and causing pain and bloodshed. In the course of the fight the appellant (who was a deputy sheriff and carried a pistol) lost possession of it. It was picked up by Scott, a bystander and witness. After extricating himself from his assailants the appellant requested Scott to restore the pistol. Scott declined and the appellant then went into his bank 125 feet distant and procured a rifle. Returning to the scene of the difficulty where he had left his coat, he shot Jack Kimbell. Upon the meeting of the parties, Charlie Kimbell opened the conversation about the note by telling the appellant that he had better "sit still in the saddle"; that they intended to pay all that they owed him. The appellant asked when, and the reply was that they would do so whenever they got ready. The appellant responded that he was going to "crack down on them," explaining which on the trial he said however, that he did not mean to fight but to sue upon the note. When Jack Kimbell joined the party, and Scott endeavored to restrain him and prevent him from assaulting the appellant, Jack Kimbell said: "You don't understand; he broke up my home." The foregoing all comes from the State's witnesses.

The appellant, after testifying touching the conversation about the note and the beginning of the fight, related the matter in substance as did the State's witnesses, stating, however, that as his assailants were crowding him and observing something in Jack's hand which he thought was a knife he attempted to pull off his coat and get his pistol, and while in a stooping position, he was assaulted by the three brothers causing the pistol to fall on the sidewalk. He received a terrific blow on his head, struck by Jack Kimbell, and "fell like a beef hit with a hammer." The blood was streaming down his face and eyes and all over his clothing. He was much agitated by the wounds and the occurrence and fearing further injury he demanded his pistol of Scott. He believed that the parties were armed,

as he knew that Jack and Oscar Kimbell carried guns. When he returned to the scene of the difficulty to get his coat he observed the Kimbells and saw Oscar advancing. He raised his gun, however, and they scattered, going in different directions. In his excitement he allowed his gun to fire accidentally, and thereafter, while Jack Kimbell was behind some automobiles and the appellant believing that he was going to be shot from there, fired at Jack Kimbell.

Mrs. Jack Kimbell approached an attorney about a divorce. The lawyer testified and said he told her that there had been mentioned to him a letter connecting Lawrence in a criminal way with Mrs. Kimbell and that before undertaking to sue for a divorce he would want to confer with Lawrence and also with Jack Kimbell. He did confer with Lawrence, and Charlie and Jack Kimbell called upon him. In August, 1926, Jack Kimbell exhibited to the appellant, John Lawrence, and a number of other people a letter purporting to have been written in Dallas and addressed to Jack Kimbell at Mesquite, Texas. The letter was unsigned but charged that the appellant and Mrs. Jack Kimbell were criminally intimate. At the time she approached her attorney about a divorce, this letter was in the possession of Mrs. Kimbell. She told her attorney that it was in Jack Kimbell's handwriting. The attorney had the handwriting investigated and upon the information received from experts reached the conclusion that the letter was written by Jack Kimbell and so told Jack and Charlie Kimbell, to which Jack Kimbell made no reply. In the interview between the attorney and Jack and Charlie Kimbell harsh language was used, most of the time by Charlie Kimbell. Among other things he said: "Before we get through with John Lawrence, we will have a fifty thousand dollar damage suit and may shoot hell out of him." The attorney told Lawrence about his conclusion and information with reference to the authorship of the letter and of the threats to take his life.

The appellant and Mrs. Kimbell, about the time of the institution of the suit for a divorce by Mrs. Kimbell against the deceased, were found in a hotel together, the appellant having registered under an assumed name of himself and wife. This occurred in the daytime, and while the parties were at the hotel, Jack Kimbell appeared. The appellant's explanation of this occurrence was that owing to the fact that the divorce suit was predicated upon alleged improper relations of the deceased's wife and the appellant, based upon the spurious letter mentioned, Mrs. Kimbell wanted to have an audience with

the appellant in some private way and that the meeting at the hotel was in pursuance of that desire and merely with that design.

Subsequent to the hotel and letter episodes the meetings between the appellant and Jack Kimbell were frequent and without unfriendly demonstration by the deceased. They had business relations thereafter and the first altercation which took place was that described above, which immediately preceded the tragedy and seems directly connected with the demand for payment of the note and to have been brought about by the deceased and his brothers, who in the affray were admittedly the aggressors.

The fact that the deceased, in advance of the divorce, contemplated suing the appellant and the fact that he did subsequently sue him for damages was adverted to several times in the verbal testimony in the course of the development of the case.

Over the objection of the appellant the citation which was served upon him nearly two months antecedent to the tragedy was introduced in evidence before the jury. The recitals therein, taken from the plaintiff's petition, are as follows:

" * * * that the defendant, by a course of flattery, etc., has alienated the affections of the plaintiff's wife from plaintiff, causing his said wife to sue him for divorce; that the defendant has been meeting plaintiff's wife secretly and has corrupted her and caused plaintiff's family to be destroyed, all to plaintiff's great damage; that plaintiff and his wife were happy prior to the defendant's attention to plaintiff's wife; that they lived near Mesquite and have three children; that the defendant, who is Mayor of Mesquite and a banker, by using his influence upon plaintiff's wife, persuaded her to leave plaintiff, etc."

Opposing the receipt of the evidence the appellant, in Bill No. 8, made specific objection to the recitals quoted. The citation was remote in its relation to the homicide. The meeting of the appellant with the wife of the deceased, the divorce proceedings and the suit for damages, all transpired many weeks before the homicide took place and before the attack upon the appellant by the deceased and his brothers was made, and in the meanwhile the parties often met. The cause of the meeting on the day of the tragedy seems to have been the notice that the bank desired the payment of its note. It seems obvious from the conduct of the parties at the time they met that the appellant was accosted by Charlie Kimbell touching the dun for the payment of the note. That due to matters antecedent thereto the feeling between the parties was not good may be well assumed,

but they had not led either of the parties, certainly not the appellant, to any overt act of aggression. When they met harsh words were spoken by the deceased and his kinsmen, the appellant was assaulted and wounded, and the deceased at the time had in his possession a pair of brass knuckles. Whether they were used upon the appellant is a subject of controversy, but it is not controverted that in the course of the affray he received a considerable wound by a blow upon the head which might have been made by the brass knuckles.

The fact that a suit had been brought having been proved verbally, the effect of the proof merely that the citation was served was unimportant. The same, however, cannot be said of the introduction of the recitals therein. They were read to the jury and pictured the dead man as having been wronged. His children, who had been made orphans by his death, were referred to in the recitals. In them it was charged not only that the appellant was the cause of the divorce but that he had used his influence and persuasive weight to bring it about. All these matters were controverted by the testimony of the appellant and his witnesses. Against the appellant the recitals in the citation were case and were singled out by the court in writing his charge in which the attention of the jury was drawn thereto in the following language:

"Now, I instruct you that said citation and the statements and allegations therein contained is no evidence of the truth of said statements or allegations, and I instruct you that if you consider said evidence for any purpose at all, you will only consider it for the purpose of aiding you, if it does aid you, in determining the motive, if any, with which the defendant acted at the time the said Jack Kimbell was killed, if he was, and for no other purpose."

This instruction might well be classified as obnoxious to the rule often announced that the court, in charging the jury, should avoid singling out isolated facts and instructing the jury with reference thereto. Moreover, the charge, while doubtless well intended, was, in the opinion of the writer, calculated to give undue emphasis to a phase of the evidence which was remote from the immediate incidents of the homicide and yet of a nature to inflame the minds of the jury to the prejudice of the appellant. During the long period of time elapsing after the suit was filed against the appellant, the record reveals no act of aggression upon his part, and the meeting immediately preceding the homicide was not of his seeking. At that meeting he was confronted by three assailants and in an attack by them was disarmed, wounded and beaten. Bleeding from his

wounds and smarting under the assault, he procured a gun and shot the deceased before he had left the scene of the encounter. The facts last recited are disassociated from the alleged relations between the appellant and the wife of the deceased. As has been stated in the original opinion, the court was not bound to instruct the jury even upon the suggestion of the appellant's counsel touching the effect of the recitals in the citation. The trial judge would have been well within his rights in refusing to refer to the matter in his charge. When the instruction which was given was framed by the court, counsel for the appellant made written objection thereto in the following language:

" * * * in limiting and attempting to control the purpose for which the jury might consider the citation in the civil damage suit, the Court charged upon the weight of the evidence, in that it specifically tells the jury that they may consider said testimony in determining the defendant's motive. The defendant says that said testimony should be limited in the charge, but that limitation placed upon it by the Court is a charge upon the weight of the evidence and is an improper one."

As stated in the original opinion, this court, in the case of Pinckord v. State, 13 Tex. Crim. App. 478, had before it a case in which Pinckord was prosecuted for an attempt to poison his wife. On the trial the State introduced the court proceedings in a suit for a divorce which the injured party had brought against the accused. The court, in a well-considered opinion by Presiding Judge White, made the following announcement:

"As a fact tending to show the feelings and relations of the parties to each other, it was doubtless legitimate to prove that the wife had instituted suit for a divorce prior to, and that the same was pending at, the time it was alleged the crime charged against defendant was committed. But it was error to permit the allegations of her petition for divorce to be read and go as evidence to the jury, and especially so without any explanation or instruction as to how far and for what purpose they were alone to be considered. As to the judgment or decree for divorce, that was clearly inadmissible, because it was rendered several months subsequent to the date of the offense alleged in this case, and could possibly have shed no light upon, or tended to illustrate in the remotest degree, any issuable matter in this case."

The unanimous opinion of this court in Powdrill v. State, 62 Tex. Crim. Rep. 443, is in harmony with the announcement above made. Powdrill was charged with the murder of his son. The ap-

pellant's wife had instituted a suit for divorce against him and had obtained an injunction. On the trial the proceedings in the divorce suit were introduced on behalf of the State. The action of the court in receiving them was held error. The court entertained the opinion that the fact that the suit had been instituted and that the injunction had been issued was relevant, but that the recitals in the petition showing the grounds upon which the divorce was sought and the injunction obtained were inadmissible. In the mind of the writer, there is no doubt as to the soundness of the conclusions announced in the Pinckord case, supra, and also in the Powdrill case, supra. So far as they deal with the point raised, the discussion in the opinions in the cases of Turner v. State, 33 Tex. Crim. Rep. 103; Robinson v. State, 16 Tex. Crim. App. 347; and Hudson v. State, 28 Tex. Crim. App. 323, are not in conflict with the Pinckord and Powdrill cases.

The nature of the facts brought into the evidence covering the transactions in the period antecedent to the occasion of the encounter in which the homicide took place is such as to make difficult the concentration of the minds of the jury upon the incidents immediately surrounding and characterizing the offense for the commission of which the accused was on trial. If the deceased, promptly upon the receipt of information or knowledge of the alleged transgressions of the appellant, had killed him and had been tried, the facts in evidence would have been available to the jury to mitigate, and under some of the evidence, excuse the homicide. The deceased, however, is not on trial, nor is the appellant on trial for any offense save that of murder.

Whatever may have been the relations of the appellant with the wife of the deceased or the divorce proceedings, they would not in law have justified the assault which the deceased made upon the appellant on the day on which the homicide took place. Against the assault made by the deceased and his brothers the appellant had a right to defend. Whether in returning and firing upon the deceased he was justified or was guilty of murder with or without malice was to be determined by the jury upon the relevant facts bearing upon the transaction in which the death of the deceased took place. If, in the judgment of the jury, upon the whole case the fact that the deceased had sued the appellant for damages, influenced him in committing the homicide it was within their province and privilege to do so. However, they were not under any circumstances privileged

676

to consider against him the recitals in the citation to which reference is made, which the court was in error in receiving in evidence.

From what has been said it follows that in the opinion of the writer the paragraph of the charge in question, implying as it does that the recitals in the citation might be considered as bearing upon the motive which impelled the appellant to kill the deceased, was erroneous. The fact that counsel for the appellant in excepting to the court's main charge suggested that the citation be limited did not waive or cure the error in giving the charge, and certainly did not cure the error in receiving the testimony to which the charge in question related. When the court framed the paragraph of the charge to which reference is made, counsel for appellant promptly presented objections thereto. Their previous suggestion that there be limitation would not be irrevocable; nor could it justly impose upon the appellant the responsibility for the vice in the charge as framed by the court. Considering the verdict assessing a penalty of fifty years' confinement in the penitentiary in the light of the evidence and the record, it is thought that it could not justly be concluded that the minds of the jurors were not influenced by the evidence improperly received in the paragraph of the charge under discussion.

The motion for rehearing should be granted and a new trial ordered.