ROY McGREW v. THE STATE.

No. 17059.   Delivered January 16, 1935.
Rehearing Denied March 27, 1935.

The opinion states the case.

*Hancock & Hancock* and *John M. Hatter,* all of Waxahachie, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder, punishment, fifteen years in the penitentiary.

We find in the record forty-nine bills of exception, each of which has been carefully examined and considered, but none of which manifests reversible error, and we deem it not necessary to discuss same.

The facts amply support the conclusion of guilt. If we

read the record correctly, it shows the following: There is a row of store buildings in Midlothian, Ellis County, Texas. C. M. Copeland had a grocery store on the corner at the end of said row of buildings. Four buildings down,—J. B. Copeland had a market. Next below was Daley's tailor shop. A street ran up by the front of said buildings and an alley in their rear. Behind the market was a platform shown by testimony to be some twenty or thirty feet from the back door of Daley's tailor shop. Deceased was on this platform when he was shot through the head. Appellant, the only eye-witness who testified, located himself no more definitely than to say as follows: "When I stepped out, he was standing out there, * * * I told him to drop it. I could not see what he had in his hand, and I just fired. * * * I was afraid he was going to kill me, as he came to the door and made a step at me. * * * This was in broad open daylight. * * * I was standing about fifteen or twenty feet from him." It was in testimony that before the shooting deceased had in the pocket of his overalls a piece of iron pipe or rod about sixteen inches in length and approximately an inch in diameter. Some of the witnesses expressed doubt as to its being as large as the one exhibited in court, and all the first witnesses to get to the body said they saw no weapon or piece of iron about the body, but others testified they found a piece of iron pipe about sixteen inches long and about an inch in diameter lying near the head of deceased after he was shot. No witness testified to any use or attempted use on the part of deceased of any weapon at the time of the shooting. It was in testimony that not long before the killing appellant and his nephew were in the grocery store of C. M. Copeland and appellant had a pistol in his hand; the nephew was reasoning with appellant; deceased came to the back door of said store and stuck his head around and called to appellant to come out of there, and appellant raised the pistol and fired at deceased. The nephew struck the hand or arm of appellant, deflected the pistol and the bullet struck the door. Deceased ran down the alley. Witnesses testified that they tried to get appellant to go home and give up his pistol but he would not do so. One witness testified that appellant repeatedly told him that he was going to kill HIM, and when witness said there is no use in that, appellant repeated that he was going to kill HIM,—not specifying who. Mr. Copeland testified that he locked the back door of his store and went down to his brother's market to tell him about the trouble and get him to come up and help quiet appellant. He said the last time he saw de-

ceased alive was when he was down at his brother's market. He further testified that when he came back appellant was walking up and down the store, and that he "sauntered to the back door," and witness did not see him again. Somehow appellant got down very quickly to the back end of Daley's tailor shop. Mr. Daley had heard of the trouble and he argued with appellant that he ought to go home. Appellant's nephew was with him down there and tried to get him to go home but to no avail. Presently Mr. Daley looked up the alley and remarked that "There comes Ted now," Ted being the deceased. Daley testified that he then went back and locked his back door and barred it and went out of the front of his tailor shop. In just a minute or two he heard the shooting. The facts conclusively show that appellant must have gone to Daley's back door, unbarred and unlocked it and gone into the alley, from which place he shot and killed deceased, who was on the platform near the back door of Copeland's market, a distance, according to Mr. Daley, of twenty or thirty feet, and, according to appellant, of fifteen to twenty feet. We quote from appellant's testimony as follows: "Dailey told me to go on home, and when he went in the market I stood there until I thought he had time to get in the market, and I was going to go out at the back, going home, and when I stepped out he was still standing out there, but looking around like that (indicating), and I told him to drop it, I could not see what he had in his hand, and I just fired. I knew he had something in his hand, but I didn't know what it was. He had on overalls. I shot the deceased because I was afraid he was going to kill me, as he came to the door and made a step at me."

Such facts as here appear do not call for a charge on the presumption arising from the use of a deadly weapon, based on art. 1223, P. C., which provides that when the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapon or means used by the party attempting or committing such murder, etc., are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury. The subject is discussed at length in Gunn v. State, 95 Texas Crim. Rep., 276. The charge given in the instant case fully and fairly instructed the jury on appellant's right of self-defense, in case they believed that deceased had started toward appellant with something in his hand, or that he did any other act which, viewed from the standpoint of the appellant at the time, and under all the facts and circumstances caused appellant to believe de-

ceased was about to shoot him, or to make an assault upon him,. or that it appeared to appellant that he was in danger, and had a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, if any, appellant shot and killed deceased, they should acquit him. The charge also told the jury that if they had a. reasonable doubt as to wether appellant was acting in his own self-defense when he shot, they should give him the benefit of' such doubt and acquit him. No witness testified that the piece of iron pipe exhibited in court was a deadly weapon, and no witness, including appellant himself, testified to any attempt on the part of deceased, coincident with or immediately preceding the shooting, to attack appellant or strike him with said piece of iron pipe or any other weapon.

Finding no error in the record, the judgment will be af-- firmed.

*Affirmed.*

ON MOTION FOR REHEARING

MORROW, PRESIDING JUDGE.—Counsel for appellant com-- plains that in the original opinion there was a failure to dis- cuss the bills of exception of which there are forty-nine in num-- ber. The number and volume of the bills rendered it practically impossible within the reasonable scope of this opinion to dis- cuss them in detail. The controlling facts in the record were stated in substance in the original opinion. In his motion for rehearing appellant has stressed several bills of exception. These bills and others will be given attention, and comment. made upon such as require it, in this opinion.

That appellant shot and killed the deceased, Ted Brown, is not controverted. Whether appellant was justified in doing so was the main question before the jury. Whether appellant's. defense was prejudiced by the rulings of the trial court is an important question upon this appeal.

Appellant and the deceased were citizens of the town of Midlothian. They were well known to each other. There was. testimony to the effect that the deceased was a man of violence, particularly when he was under the influence of intoxicating liquor. There was also testimony that upon the occasion of his death the deceased was intoxicated. The tragedy took place at the back of Copeland's market. A general store was con-- ducted by G. M. Copeland. His brother, J. B. Copeland, con- ducted a market. The store and the market were on the same street but were separated by three buildings. Sometime before-

the tragedy, but upon the same day, appellant came to the store of G. M. Copeland and left his pistol in the cash register. He subsequently came back into the store and was seen by Copeland standing near the back door of the store. According to the same witness, the deceased walked up to the back door and said: "Come out of there." When the deceased said that the appellant drew his gun. Appellant's nephew pulled the gun down and it fired, the bullet going through the door. The deceased then disappeared. Leaving appellant in the back of his store, G. M. Copeland went to his brother's market, remained there for a few moments and upon his return found appellant and his nephew still at the back of the Copeland store. The witness endeavored to disarm the appellant but failed in doing so.

J. B. Copeland testified to the following effect: He was out in front of his market and saw deceased in the back of the building. Deceased stayed at the market about a minute or so and then said to the witness: "If you don't want to see something you had better turn your head and go up to the front of the market." From the witness we quote: "He (deceased) stood there around the door with an oil can in his hand, I judge about twelve or fourteen inches long. * * * I do not think the can had anything in it. * * * He was in his shirt sleeves at that time, and I believe in a pair of overalls."

Deceased walked into the market and asked the witness to let him have his gun but the witness had no gun. In the meantime, G. M. Copeland came to the market and reported that there was trouble at his store. According to J. B. Copeland, the deceased said: "Roy had made a gun play" and "It was just too bad." The witness did not let deceased have his gun. The witness testified further: "I had seen the defendant, but had seen the deceased about three or four times that day—the last time was when he went towards the back door with something in his pocket that looked like a piece of pipe or something."

Later appellant came to J. B. Copeland and handed him his gun. He appeared to have been drinking. In answer to an inquiry, appellant said that deceased was back of the market. The witness went there and saw the deceased who was still breathing but died soon afterwards. From the testimony we quote further:

"When I first saw the deceased lying there I did not notice any iron pipe or weapon near him, but when I went back later, a minute or two afterwards, we noticed a piece of shafting

about fourteen or sixteen inches long laying about where his head was—laying about six inches, I would say, from his head."

The witness also testified: "I was under the impression that the piece of iron deceased had when he came into my place of business was a little smaller than this piece of iron shown me, but not much different. When he came in he had this piece of iron in his overalls pocket, and his hand in his pocket."

Touching the matter of weapons, G. M. Copeland testified that he saw no weapon in the hands of the deceased. Edgar Allen testified that while he was in the grocery store the appellant came in through the back door. A little boy was with him. Appellant had a pistol in his hand. The boy was grabbing at it. The witness testified: "I talked to the defendant and asked him what he was going to do, and he says, 'I am going to kill him.' I did not know who it was. I says, 'There is no use of that,' and he says, 'Yes, I am going to kill 'em.'"

This occurred about five or ten minutes before the deceased stuck his head around or in the door. The deceased said: "Come on out Roy." Appellant then grabbed his gun and fired. The little boy jerked the gun down and the bullet went through the bottom of the door. The witness did not see the deceased any more until after he was killed. The deceased was lying at the back door of Copeland's market. The witness Allen testified: "I saw where he was shot—just above the ear on the left hand side. I saw no guns or weapons around or on the deceased. * * * Deceased breathed two or three times after I got there. * * * After the deceased was killed I went down there in the rear, near Copeland's market, where the deceased was lying. I saw no iron bar or anything lying near the deceased. I did not look in his pocket for anything."

The witness H. H. Tunnels testified as follows: "Just as I went out of Copeland's store, the deceased was coming out of the store, bare-headed and did not have his coat on. He went into Copeland's meat market. * * * I saw the deceased after he was killed, just a few minutes afterwards, at the back of Copeland's meat market, on a little platform back there. * * * I did not see any weapon, guns, or anything like that around there."

Leon Daley testified that he was expecting trouble; that he heard a shot fire. After hearing the shot, the witness saw appellant who came to the front of the shop. A boy was with him. Appellant said that he had just shot Ted (deceased) and told the witness to call an officer. The witness testified: "I went back to the rear and saw the deceased lying on that little

platform. * * * I only saw one bullet hole. I did not see any gun or weapons around the deceased. * * * He was in his shirt sleeves, and he was lying about twenty feet from the back door of my shop—just back of the back door of Copeland's market,. * * * and lying on his back with his feet near the door. * * * I think he was dead when I saw him."

If we understand the testimony of Cotton Johnson, it is to the effect that he saw appellant enter the rear of G. M. Copeland's grocery store and saw deceased walk up to the door and motion to appellant to come out. Appellant shot out through the screen door. Deceased then ran around to the back. The witness said he did not see any weapon of any kind in Ted Brown's hand. A few minutes thereafter he saw the deceased peep around the corner, but saw nothing in his hand.

The State's witness Dave Fearis, who invesigated the killing, testified to finding a rod about sixteen inches long and about an inch in diameter.

From the appellant's testimony it appears that he had known deceased for some eight or ten years; that he knew the general reputation of the deceased as that of a violent and dangerous character when under the influence of liquor. From appellant's testimony we quote: "Knowing Ted Brown as I did, and his reputation as a dangerous and violent man, and knowing the men he had beaten up, I knew he would kill me, and I would not have shot him if I had not thought he was fixing to kill me."

On cross-examination appellant admitted that he had been fined several times and had also been indicted for violation of the prohibition law; that he had had trouble with other persons. From appellant's testimony we quote further: "I saw that he had something in his hand when I was standing about fifteen or twenty feet from him. This was in broad open daylight. But I could not tell what he had in his hand, but know that he had something. (Witness shown a rod of iron.) I do not know whether that is it or not, as I was standing some fifteen or twenty feet way and I could not tell what it was, and he turned and started at me, and I shot him."

Bill of exception No. 16 complains of the refusal of the court to instruct the jury as follows: "I instruct you that if you believe from the evidence that the deceased, Ted Brown, was making an attack or advancing on the defendant, Roy McGrew, with a deadly weapon at the time of the alleged killing of deceased, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict 'not guilty.' "

The special charge was refused.

The statute, Art. 1223, P. C., reads as follows: "When the homicide takes place to prevent murder * * * if the weapon or means used by the party attempting or committing such murder * * * are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

From the annotations of the statute showing the expressions of this court it seems manifest that upon the trial the proof should show the nature of the weapon against which the accused defended, together with the proof that the deceased was using the weapon. In the present instance the proof is lacking in each of these particulars.

The witness J. B. Copeland, a witness for the State, testified on direct examination as follows: "When I first saw the deceased lying there, I did not notice any iron pipe or weapon near him, but when I went back later, a minute or two afterwards, we noticed a piece of shafting about fourteen or sixteen inches long laying about where his head was, laying about six inches, I would say, from his head. (Witness shown piece of iron shafting about an inch in diameter). Yes, that is the piece of iron, or one just like it, a piece of shafting or axle or something."

It is observed that appellant did not testify that the deceased had an iron bar in his hand at the time he shot him. He went no further than to say that he knew deceased had something in his hand but could not tell what it was. Deceased was from fifteen to twenty feet away from the appellant and the homicide occurred in the day-time. It appears to have been uncontroverted that appellant shot deceased as soon as he saw him. As heretofore pointed out, the witnesses who first went to the scene of the homicide declared that they saw no weapon of any character near the body of the deceased. There was testimony, coming from some of the witnesses, to the effect that when they returned to the scene an iron bar was lying near the head of the deceased. Reference is made to the evidence hereinabove set forth for a detailed statement of the testimony bearing on the question as to whether the charge sought by the appellant was called for.

Whether the deceased had anything in his hand, either during the first or the second encounter with the appellant is, as is apparent from the evidence, a controverted question. Describing the first time he shot at the deceased, and also the fatal encounter the appellant said: "Ted Brown walked up to

the door and had his hand like that (indicating). Whether he had anything in it I cannot say, and I shot, and the boy knocked my hand down. Ted went away, but I did not know where he went to, and I stood there a few minutes and went out there and started home to go down the alley and Dailey was standing there, and I stood and talked to him there at his tailor shop; and I had not been there, I don't reckon, over two or three minutes, or something like that, and someone in the bunch looked up and says, 'There comes Ted now'; and so they shut the door and Dailey told me not to have any trouble in there; and I says, 'I am not going to let him hurt this boy'; and I says, 'I don't want him to follow me any further'; and Dailey told me to go on home, and when he went in the market I stood there until I thought he had time to get in the market and I was going to go out at the back going home, and when I stepped out he was still standing out there, but looking around like that (indicating), and I told him to *drop it*. I could not see what he had in his hand, and I just fired. I knew he had something in his hand, but I didn't know what it was. He had on overalls."

The above is the sum total of the appellant's testimony touching the assault by the deceased and the possession of arms or weapons by him.

In the present instance, to justify the appellant in killing the deceased under the circumstances detailed by him, it was necessary that appellant have actual belief in the existence of the danger of losing his life. The belief must be founded upon reasonable ground, viewed from the appellant's standpoint. See Forrester v. State, 109 Texas Crim. Rep., 361.

In the case of Lawrence v. State, 18 S. W. (2d) 181, it was declared: " 'When the homicide takes place to prevent murder, * * * if the weapon or means used by the party attempting or committing such murder,' etc., evidences plainly that the weapon must be *actually used or attempted to be used* in some way, and that the homicide took place to prevent its use or attempted use."

We are constrained to hold that the testimony in the instant case, to which reference has been made, fails to show that the deceased either actually used or attempted to use a *deadly weapon* at the time the appellant shot him. Hence the holding in Lawrence v. State, supra, is controlling. It might he added that in the first subdivision of the third paragraph of the court's charge, the law of self-defense is defined in an unexceptional manner. In the second paragraph of the charge of

self-defense, the following instruction to the jury is embraced: "If you believe from the evidence beyond a reasonable doubt that the defendant voluntarily shot Ted Brown with a pistol and killed him; but you further believe from the evidence, or if you have a reasonable doubt thereof, that at the time of so doing that the deceased started toward the defendant with something in his hand, or did some act which, viewed from the standpoint of the defendant at the time, under all the facts and circumstances within his knowledge, caused the defendant to believe that the deceased was about to shoot him or make an assault upon him, and that it reasonably appeared to the defendant, viewed from his standpoint at the time, that he was in danger, and that there was created in his mind a reasonable expectation or fear of death or serious bodily injury at the hands of the deceased, and that acting under such reasonable expectation or fear, if any, the defendant shot and killed Ted Brown, then you will acquit the defendant upon the ground of self-defense; or if you have a reasonable doubt as to whether the defendant was acting in his own self-defense when he shot, if he did, you will give the defendant the benefit of such doubt and say by your verdict not guilty."

In his exceptions to the charge of the court, paragraph one reads as follows: "Defendant specially excepts to the court's charge because the same omits and fails to limit the purpose of testimony introduced as to certain extraneous complaints and offenses against defendant."

The third paragraph of the court's charge contains the following language: "You are further instructed that you can not use any of the testimony adduced in this trial in reference to the defendant's being heretofore indicted and paying fines as any evidence of his guilt in this case, but same may be used by you in aiding you, if it does, in passing on the credibility of the defendant as a witness, and may be used by you for no other purpose."

Bill of exception No. 36 contains the following: "On cross-examination of defendant's witness Grady Love the State was permitted over the objection of defendant to ask said witness whether or not witness knew that defendant had been billed by the Grand Jury of Ellis County for selling whisky; defendant timely objected, but was by the court overruled, to which action defendant timely excepted, because such was prejudicial and inflammatory to rights of defendant."

Appellant presented the issue of his right to a suspended sentence. He testified that he had never been convicted of a

felony and introduced testimony tending to show his good reputation. Under the circumstances developed from the record, we do not regard the bill as presenting reversible error.

Bill of exception No. 39 raises the complaint of the appellant of the refusal of the court to receive the testimony of the witness Martin relating the trouble which the witness had with the deceased prior to the killing. According to the bill, the witness would have testified that prior to the killing the deceased, while in a drunken condition, attacked the witness, and if a constable had not interfered the witness would have killed the deceased in his own self-defense. We fail to perceive the revelancy or the importance of the bill as presented. The question mainfestly called for an answer embracing the opinion of the witness as what might have happened under certain circumstances. That the deceased had been drinking is shown by the evidence of other witnesses and was not a controverted matter. Martin testified that he had been a night-watchman for a number of years; that the general reputation of the deceased was that of a violent and dangerous man when under the influence of whisky; that it was pretty bad. The witness testified: "While I was night-watchman I had trouble with Ted Brown."

Reference is made to Bill of exception No. 42, from which it appears that appellant's witness, Oscar Seal, testified that deceased had beaten him up. The bill recites that the witness would, if permitted by the court, have testified further that the deceased had jumped on him and beaten him brutally and without cause or provocation. The violent character of the deceased was shown without controversy. We think no error is shown.

From Bill No. 43 it appears that while the witness Oscar Seal was on the stand, he was asked if he had not been beaten up by the deceased prior to the killing. The court remarked: "Let us stay off of the trial of a half a dozen other cases." In a timely manner, appellant excepted to the remark of the court. The bill gives little information as to the testimony of the witness. Assuming that the remark of the court was not a happy one, the possibility of injury to the appellant is not perceived. There is much testimony in the record to the effect that the deceased had been in difficulties with other individuals and that when in his "cups" he was a violent man. It is to be observed that Oscar Seal testified upon the trial that he lived in the Midlothian community for some twenty-five years; that he had known the deceased during his life-time for some eight or ten years and knew his general reputation as being a vio-

lent and dangerous man when under the influence of whisky; that it is bad. We do not think the bill presents any error which would justify a reversal of the judgment.

From Bill No. 44 it appears that while appellant was objecting to the remarks of the court as set out in Bill of exception No. 43, the District Attorney remarked: "He (defendant) would not have much apprehension about him or he would not have gone up there to the city hall and had a few drinks with him."

We fail to perceive any reversible error in the bill. It seems to have been a "side-bar remark" but whether it referred to a real or imaginary incident is not disclosed by the bill.

The motion for rehearing is overruled.

*Overruled.*