J. T. HALBERT v. THE STATE.

No. 20614. Delivered December 20, 1939.
Rehearing Denied March 20, 1940.

The opinion states the case.

*Vickers & Campbell,* of Lubbock, *G. C. Jackson* and *John T. Spann,* both of Crystal City, and *S. Engelking,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

The offense is murder, and the punishment assessed at confinement in the state penitentiary for a term of five years.

The facts produced by the State show that appellant, a man sixty-four years of age, had a wife, Mrs. Lena Halbert, who lived with him in the town of Crystal City, in Zavala County, for two years prior to the killing herein complained about. Appellant was the recipient of a pension from the Federal government. We gather from the record that both he and his wife had been previously married, and had children from such

former marriage, none of whom lived with them. That sometime prior to the killing appellant and his wife had endeavored to divide their properties, the first home going to appellant, and the one being purchased next door to where the deceased, B. G. Holloway, lived,—he being pastor of the Baptist church at Crystal City,—going to Mrs. Halbert. The title to this last home being taken in the name of appellant's wife and he taking title to the first home. There was no friction between appellant and deceased on July 10, 1938, at which time appellant, who owned an automobile and a trailer thereto attached, sold some of the furniture to Mrs. Hooks, and attempted to sell a rug, a portion of such furniture, and, upon her refusal to purchase such rug, she testified he made the remark that he was leaving his wife, that she would not sit on his knee any more, that he was going where he could find plenty of pretty girls. It is also shown that he made remarks of like import to other witnesses to the effect that his wife was going through the change (of life) and would not have anything to do with him; that she had been a good little heifer, but that they could not get along; that she would not let him play with her any more, and he was going to some other part of the country where he could have a little fun; that he was going away and not coming back; that he was going to where they had more women.

Appellant left in his car and trailer on July 10th, and left his wife at the new home next to the deceased, saying he was going on a fishing trip. He returned on August 10th and found that his wife had rented the home, or a portion thereof, to an evangelist singer by the name of Smith, who was living there with his daughter, Barbara Smith, and that his wife was working for Rev. Holloway, Mrs. Holloway being an invalid, and who needed some one to attend to the household work. Appellant had previously recommended his wife for such work, stating that he had found her doing such work, and that she could do it again. Three days after his return, to-wit: on August 13th, appellant consulted a lawyer, and had filed a petition for divorce, took his wife to the lawyer's office, and the wife signed a waiver of citation therein, the petition alleging cruel treatment on the part of his wife. Appellant testified that he then began to hear rumors of misconduct between the deceased and his wife, and that certain suspicious circumctances were observed by him that caused him to think that there were improper relations being maintained between the deceased and his wife. The division of property was made on August 12th, and the divorce filed on August 13th, and on the same day appellant rented the pistol with which the deceased

was shot. After that appellant claims to have had many conversations with his wife, attempting to get her to come back and live with him, and it was his theory that the deceased would not allow the wife to do so; that the deceased's influence over appellant's wife was so great that appellant could not control her, and although the wife would promise to return to him, the deceased would talk to her and she would have some excuse for not coming back, the usual one being that the deceased would not agree for her to do so. The deceased was in the hospital sick from June 27th to July 28th; about the 6th or 7th of August he was under treatment at San Antonio for about ten days. Sometime in August the deceased took his wife, an invalid, to Reagan Wells, and Mrs. Halbert went along with them, a nephew of the deceased driving the car. When the parties were getting ready to leave, appellant appeared on the scene and requested his wife to go with him, appellant,· in his car. The deceased stated that they might need her with deceased's wife. Appellant followed them in town and out of town, and finally ran his car at a high rate of speed and got in front of the deceased's car out on the road, and again tried to get his wife to get out of the deceased's car, where she was riding with deceased's sick wife and the deceased's nephew on the front seat;—this Mrs. Halbert refused to do. He followed them again for quite a distance, and again ran his car up to and in front of them, ostensibly for the purpose of telling them that one of their tires needed some air. Finally the deceased reached his destination, and after having spent about an hour locating his wife in convenient surroundings, the deceased and the nephew returned to Crystal City, leaving the two women at Reagan Wells. In the meantime Mrs. Holloway, the deceased's wife, had told appellant that she intended to discharge Mrs. Halbert on September the first, Mrs. Halbert having worked there for a month or so before any objection thereto had been made by appellant.

After the two women had stayed awhile at Reagan Wells, the appellant testified that he approached Rev. Holloway and asked him if his wife had returned from the Wells, and the deceased said that she had not. In the meantime appellant had moved his trailer from a distant part of town and had parked the same across the street and in front of the house where his wife lived. There was some undisclosed trouble relative thereto, and a deputy sheriff soon came up and took appellant into custody and conveyed him to the court house, keeping him there only a short time, and then releasing him. He then returned to his trailer. Soon thereafter, according to his testimony, he saw

some children trying to get in the Holloway house and no one answered their calls; the front door seemed to be locked. He then saw his wife at her home next door and went over to her and gave her a letter from her daughter. Appellant then went back across the street to the trailer. He could see his wife reading the letter, standing in the screened front door. He then saw the deceased coming from his home and going through a low salt cedar hedge that separated the two back yards, toward appellant's wife's home. He heard the deceased call Mrs. Halbert, and she came towards the back of the house. Appellant approached his wife's home, and as the deceased passed the house corner "he throwed up his hand (this way) like he was going to shoot, and he had something in his hand, and I took it to be a gun, but the gentleman was so quick I could not say it was a gun, but I most knowed it was a gun he had in his right hand, holding that kind of stub over it, going in a hurry. As to what I did from the time I saw him coming thru the hedge, well, when I saw him coming thru' the hedge in a hurry and saw he had something in his hand, and I took it to be a pistol, he went on to my back door and called my wife, and she dropped her hands holding the letter and ran to the back door to see him, there are three doors in a row, and I could see she ran all the way back; * * * When he went around the house, he was standing right agin the step, and my wife was on the top step; they were just as close as could be, and when he throwed his hand up, he looked like he was going to shoot, and I flinched, and I shot, I do not know how many shots, I shot until he fell, and I went around thru' the house, and met a woman there, and she fell down on the floor, and I told her I was not after her, and I went to the court house and gave up. I do not know what was the occasion of my going thru' the house, I just do not know, except I guess, I thought—never could think why I went thru' the house. I did not say a word to Holloway, and he did not say anything to me, not a word spoken. * * * As to whether he had anything in his hand, I did not have time to look, I did not see anything in his hand, I was looking out for myself; as to how soon after he did that that I commenced to shoot, as quick as I could raise my hand, I commenced. I commenced to shoot to try to protect myself."

In contradiction of the above, however, the State introduced a statement made to the sheriff soon after the killing by the appellant, which is as follows: "In connection with the statement that was made by the defendant to me in reference to that gun and where it could be found, in that same conversa-

tion he told me that he was standing in his trailer house looking out the window to where his wife lived, that he saw Holloway cross the hedge and go to his back door, that he saw a woman go from the front of the house to the rear that he thought was his wife until after he killed Holloway and came back thru' the house and found out he was mistaken, that it was another woman; he said when he turned the corner Holloway was stooped down over a barrel of feed, that when he raised up he had a cup or can in his hand, he looked around and saw him and threw up his hand and went to shooting. Holloway threw up his hand, and Halbert went to shooting; his first shot was low and he leveled his gun, then he walked thru' the house, went to the court house and waited for an officer."

It is worthy of note that the deceased was a one-handed person, the left hand being gone at the wrist, and that persons at the scene of the killing soon after it happened testified that the deceased was right near a barrel filled with chicken feed, and lying near his hand there were two buckets of chicken feed, a small bucket telescoped within a larger one, and no weapons of any kind near the body. It is also shown that appellant immediately went through this house, and came upon the witness Barbara Smith therein, who fled and fell down, at which time appellant told her: "I am not after you." The appellant then secreted his pistol and immediately repaired to the sheriff's office and surrendered, and made the above set forth statement to Mr. Anglin, the sheriff.

The only serious question presented to us herein, so we think, is reflected in bill of exceptions No. 14, which reflects the following occurrences:

After the defendant had testified to the marked attention by deceased to his wife, and his conduct during such time, and after the State and defendant had offered testimony relative to the deceased's reputation for chastity, the State offered Dr. Poindexter, and elicited from him, over appellant's objections, the fact that he was deceased's physician and had been since about April, 1938; that during said period the deceased had been continuously ill, having muscular weakness, low blood pressure, etc., including impotency. That such physical condition of the deceased continued until the time of his death. One of appellant's main contentions was that if he was guilty at all, the offense was no greater than murder without malice. To support this contention, he offered evidence of the conduct of the deceased and his attention to appellant's wife, which

would tend to create in his mind a well-founded belief that the deceased not only entertained improper motives but had improper relations with his wife. To strengthen this theory, he offered proof of the deceased's general reputation as an immoral man.

We here quote the main portion of such bill No. 14: "Doctor C. A. Poindexter was called as a witness by the State in rebuttal and over the objections and protest of the defendant was permitted to testify that he was physician for the deceased during his lifetime, and had been seeing him since about April, 1938; that during such period of time deceased was continuously ill, having a muscular weakness and low blood pressure and quite a bunch of symptoms, including impotence as well as a very bad gastro intestinal disfunction; that deceased was also in the hospital at Crystal City from June 17 to July 28, and witness saw him almost daily until he (deceased) went to San Antonio, in early August, where he remained possibly ten days, and that the physicial condition of the deceased as above related continued until the time of his death. When such testimony was offered the defendant objected to the same because it is immaterial and irrelevant to any issue in the case and not a proper inquiry."

In the condition that this bill is presented to us we find it to be an improper one in that there was a portion of said objected to testimony that was clearly admissible; in fact all of such seems to be admissible except possibly the words "including impotence." The objection thereto going to all of the proffered testimony, and the objection itself being only that same was immaterial and irrelevant. This objection is not tenable. Undoubtedly a large portion of such testimony would have been material under the facts in this case, appellant testifying that he had not observed what he though to be any misconduct between the deceased and his wife prior to August 10, 1938; that after such date and before September 1, 1938, he had observed them together many times, and under such circumstances as to cause him to believe that they were not conducting themselves properly. It seems to us that if the deceased was in the hospital sick for such a length of time, and suffering from the diseases outlined in his doctor's testimony, such would have gone far to destroy the effectiveness of the appellant's testimony of the many times he had seen the deceased and appellant's wife together, and would not have been immaterial. If the two words "including impotency" were eliminated, it occurs to us that the remaining portion of this testimony was clearly admissible. Then let us see what the effect

of the admission of such two words could have had on the case at bar. Appellant does not claim that an act of intercourse was had by the deceased with Mrs. Halbert. We quote his testimony: "* * * I love my wife more than any woman living; I still think a lot of her, and I still know she is a good woman. As to whether I never in my life knew her for anything but a good woman, I knew she ran around with Holloway, that I thought it was better to get her back and away from Holloway, and have her out of that town. I know she is a good woman; it was being persuaded by some other man; I sure do think she had gone wrong."

It is also to be observed that the sickness of Rev. Holloway and his stay in the hospital was testified to by other witnesses without any objection being made thereto.

Appellant contends that this association of his wife and the deceased operated upon his mind to such an extent that same was rendered incapable of cool reflection, and while in such condition he committed this offense, and that the fact of the deceased's impotent condition was unknown to him. It is worthy of note that appellant had been tried once before for this identical offense, and we quote an excerpt from his testimony on that former trial reproduced on this trial in order to show what was operating on his mind at the time of the killing:

"Q. You were calm enough on that occasion to judge where the bullets took effect? A. To some extent.

"Q. You aimed your gun? A. Yes, I never get excited, I keep my excitement in a pinch.

"Q. You were not then laboring under any excitement? A. Not a bit in the world.

"Q. You testified, I believe, in your early cross examination that you were not afraid? A. No, sir, I was not afraid, I never saw a man I was afraid of, no time and no where.

"Q. After you had shot him down on the ground and he had fallen, did you stop to see if there was anything you could do for him? A. No, sir, I did not, because I did not think that anybody could do anything for him.

"Q. You figured you had killed him? A. I figured I had.

"Q. You figured that because you wanted to kill him? A. Yes, certainly, I went around there to kill him.

"Q. That is what you left the trailer for, for the purpose of killing him. A. I wanted to see what was up, and if necessary then I would.

"Q. You went around with that purpose in mind to kill him?

A. Yes, if necessary, I wanted to protect my self and if necessary, if I found him in any compromising position with my wife.

"Q. You shot him until he was dead? A. Until he fell.

"Q. You did not look around to see if there was any arm there? A. No, sir, I did not.

"Q. You did not look around to see if the man was unarmed or armed? A. It did not make any difference, it was too late."

As to his testimony on this instant trial, we have already set forth that portion of his direct examination that deals with the actual scene of the killing. It seems to us that this testimony does not show any degree of rage, resentment or terror such as to render the mind incapable of cool reflection on account of misconduct of the deceased and appellant's wife, but to the contrary he seemed to be cool, calm and collected, and not laboring under any undue excitement of any kind, and claimed to have shot in self-defense. It is elementary that the trial court should charge the law as same applies to the facts produced upon the trial of the case; it is not his duty to lay down the law that could be made to apply to any criminal cause, else trials and charges would be interminable; and it is worthy of note herein that nowhere do the facts show any other theory save that of self-defense. It is our opinion that bill No. 14 is faulty in that it contains an objection to matters that are clearly admissible, and that the objection made to the matters about which there might be some question is an improper one, and such testimony does not come within the grounds of the proffered objection. We therefore overrule this bill.

The testimony given by the sheriff relative to what appellant told him while confined in jail was admissible under the provisions of Art. 727, C. C. P., and the decision of this court in the case of McClure v. State, 100 Texas Crim. Rep. 545. Through his admissions in this conversation the sheriff found the pistol with which the crime was committed, and under the holding in the above case the rest of the same conversation became admissible as well as that portion dealing with the finding of the pistol.

Appellant complains of the court's charge because the court failed to instruct the jury relative to the previous relationship existing between the deceased and appellant's wife. It occurs to us that if the court had done so, he would have singled out testimony and such an instruction would have been one on the

weight thereof. The court did charge that in cases in which the defendant is charged with murder it is the duty of the jury to consider all facts and circumstances in evidence surrounding the killing, as well as the previous relations of the parties, if any, together with all relevant facts and circumstances tending to show the condition of the mind of the accused at the time of the homicide, in order to determine whether the homicide was committed with malice aforethought or not. Under the evidence as stated this was the only matter which might have caused appellant's mind to become inflamed or agitated. Nor did the court err in declining to give appellant's requested instruction relative to the effect that homicide is justifiable when committed by the husband upon one taken in the act of adultery with his wife, because the evidence was not sufficient to justify such an instruction.

All other matters complained of which showed contradictory testimony given by appellant on his former trial, as well as any contradictory statements made by him, were admissible for the purpose of affecting the appellant's credibility as a witness.

Finding no error herein, the judgment is affirmed.

ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

A vigorous motion for rehearing has been filed in this cause, and while no authorities have been cited for the position taken, we recognize the force in the arguments made and have reconsidered the questions raised in said motion, though each of them was treated in the original opinion with a satisfactory conclusion.

It may be understood that two judges writing on a subject may reach the same conclusion and yet employ quite different language in doing so. Indeed, they may indulge quite different reasoning and yet be able to concur in the final conclusion. The manner of reaching it is the work of him who writes the opinion. The conclusion in the case is the judgment of the members of the court. It occurs to us that the motion filed herein discusses more forcefully the manner by which the conclusion was reached than it does the conclusion itself.

The chief complaint concerns discussion of appellant's Bill of Exception No. 14. A proper analysis of that bill conclusively shows that the court has followed a long line of authorities holding that where a bill of exception complains of the admission in evidence of matter which should be excluded and also

of matter that was proper evidence, the court would be unable to differentiate and the bill will be held to be defective. This is not a technical rule but the proper rule long applied to the preparation of bills of exception. It may be that in some cases the rule would be an unnecessary one but in a wide range of experience of those who have preceded us, finding it necessary, have so laid down the rule. Branch's Ann. Tex. P. C., Sec. 211, p. 135, and authorities there collated; also Aven v. State, 77 Tex. Cr. R. 37, 177 S. W. 82; McKinney v. State, 80 Tex. Cr. R. 31, 187 S. W. 960; Davis v. State, 83 Tex. Cr. R. 545.

While it may be that the foregoing is sufficient to properly dispose of the motion, we are constrained to re-affirm the assertion in the opinion that the appellant's case is one of self-defense. Should it be considered that all of the testimony complained of in Bill of Exception No. 14 is "irrelevant and immaterial," it is not shown to be harmful to the appellant's cause. There is no indication that it was in any sense inflammatory or prejudicial, and in fact, the bill makes no such complaint. That being correct, it certainly is harmless.

The appellant's motion for rehearing is built largely on the theory that his defense was that he killed the deceased because of misconduct with appellant's wife. Viewed as a whole, the testimony on this subject is nothing more than a long series of details as to the discord existing between appellant and his wife, with a strained effort to involve the deceased in their domestic affairs, which we view as insufficient to raise such an issue before the jury. A climax had been reached in their trouble before Mrs. Halbert went to work in the home of the deceased. Her presence there is thoroughly justified by the evidence. If there had ever been an occasion for an outburst on the part of the appellant, his dealing with the deceased and the intervening circumstances could be no cause for the action which he took as a finality. The circumstances of that particular day and hour were insufficient, within themselves, to justify the slightest suspicion of misconduct between them. Appellant went over to the house armed for the purpose of killing the deceased if he found him in a compromising relationship with his wife. They were standing on the steps on the outside of the house. Another woman was present in the house. Appellant failed to find what he was expecting. He says he then shot the deceased under the deliberate belief that the deceased was about to take his life. The two defenses are incompatible, yet both were properly submitted to the jury—this by reason of a highly technical rule favorable to the defense. The fact that appellant had long been angry at the deceased because of

their differences could not be sufficient to warrant taking his life under the circumstances of this case as reflected by appellant's own testimony as to the things that transpired, ending the final chapter of the sad drama. At most, he had only suspicious circumstances, too weak to warrant a conclusion of unfaithfulness by a wife theretofore true as he said and, with certainty insufficient to toll a human life. The matter of self-defense was properly submitted to the jury. They have passed on it and we consider that in doing so they have decided the case.

The motion for rehearing is overruled.