etc., thereby inflicting serious injuries upon Martin and some of his crew.

We deem the evidence sufficient to sustain the conviction.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the court.

On Appellant's Motion for Rehearing.

CHRISTIAN, Judge.

After carefully re-examining the record in the light of the motion for rehearing we are constrained to adhere to the conclusion expressed in the original opinion.

The motion for rehearing is overruled.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

JAMISON v. STATE.

No. 21233.

Court of Criminal Appeals of Texas.

Feb. 5, 1941.

Rehearing Denied March 19, 1941.

J. R. Bogard, of San Augustine, John R. Anderson, of Center, and R. A. McAlister and S. M. Adams, both of Nacogdoches, for appellant.

Lloyd W. Davidson, State's Atty., of Austin, for the State.

CHRISTIAN, Judge.

The offense is murder; the punishment, confinement in the penitentiary for fifteen years.

The trial was had in Nacogdoches County on a change of venue from San Augustine County.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed George Burnaman by shooting him with a gun.

The homicide occurred on the 10th day of April, 1939, near the home of the appellant. Appellant and deceased were farmers and were engaged in cultivating certain tracts of land on the Blount farm in San Augustine County. Shortly before the homicide they had a dispute relative to a fence deceased had constructed. It also appears that, over appellant's objection, deceased had placed some barrels of gasoline on or near the premises of appellant. According to appellant's version, deceased had interfered with appellant's right to use a pasture on the Blount farm, which was part of the Blount premises. Again, a few days before the killing deceased had threatened to strike him with a mattock. It was also appellant's version that deceased had no right to use a private road near appellant's house.

It was the theory of the state, given support in the testimony, that appellant had bought a shotgun shell loaded with buckshot and had prepared himself to kill deceased when a convenient opportunity arose. In going to the land he was cultivating it was the habit of deceased to travel a road which passed near the appellant's house. In entering his leased premises when traveling this road deceased went through a gate or gap which he had to open and close. On the occasion of the homicide he had driven through this gate in his automobile, had left his car and closed the gate and had started to return to his car when appellant appeared on his front porch with a shotgun and commanded him to stop. According to appellant's version, deceased refused to stop, and went toward his car. He testified that deceased customarily carried a rifle in his car, and he believed it was the purpose of the deceased to procure the rifle and kill him, and so believing he shot the deceased as he reached the rear of his car. It was the state's further theory, given support in the testimony, that at the time appellant killed deceased was making no demonstration and that appellant's act in shooting him was unwarranted and unprovoked. A witness for the state, who lived in view of the home of the appellant, testified that she saw the appellant and heard the discharge of the shotgun. She ran immediately to the scene of the homicide, and found that deceased was dead. According to her version, he was unarmed. The wife of the appellant, who witnessed the homicide, testified that the state's witness to whom we

have referred went to the car of the deceased and took something from it. Several witnesses for the state, who reached the scene of the killing before the body of deceased had been removed, testified that deceased was not armed and that there were no weapons in his car. The wife of deceased testified that deceased's gun was in their home at the time of the homicide. It appears that the buckshot fired from the appellant's gun entered the left side of the deceased. At this juncture we quote from appellant's testimony as follows:

"At the time I got this buckshot I had heretofore been buying buckshot and keeping them for the hawks. That was the only one I had. The first time I saw Mr. Burnaman he was stopping his car. He was opening the gate while I was getting my gun. I got my gun to go out there and talk to him. When I went out on the gallery I stood about like to step out off the front door step. I believe there are six posts on that gallery and I was standing between the two posts leading out into the yard. As to how far it is from my door that I came out of that room until I reached the porch, it was about eight or ten feet; the gallery is eight feet, and that would make about sixteen feet that I traveled. When I got out there and looked towards Mr. Burnaman he was going towards his car, and I asked him to stop and he kept going to the car, and Mr. Burnaman was looking over his shoulder at me, kind of with his head turned; he never did stop. When I told him to stop the first time and that was his car, he looked at me this way. I threw my gun on him and the second time asked him to stop he kept going to his car. About the time I shot he was going on the other side of his car, and I believed that George Burnaman was going after his gun; I asked him to stop four times. I went out there to talk to him. That was since the racket about the fence. Mr. Burnaman did not say or do anything to me; he didn't say a word to me. When I told him to stop the first time he kept going. I had my gun in shooting position then; no, not at the first time, but at the second time. When I asked him to stop the first time I intended to talk to him, to get at that trouble and stop it out there. When I shot him I did not have any other shells with me at that time. When I went and got my gun I didn't have any other shells there; the shells were in the dresser drawer. I did not take them with me. The gun was loaded with this buckshot shell that I had when I went out there. If Mr. Burnaman had stopped I would have talked to him. When I shot Mr. Burnaman fell; he did not say anything. All I heard out of him, I heard him groan; then I turned around and laid my gun down and told my wife I was going to town. I went out the front gate."

Again, we quote from the testimony of the appellant as follows: "I saw Mr. Burnaman as he closed the gate. He seen me too. When he took the first step from the gate to get back in his car I had not at that moment leveled my gun on him. I don't know whether or not I am positive I didn't. When I walked out of the house I had my gun in my hand and I asked him to stop the first time and he looked at me, and I leveled my gun on him the second time I asked him to stop. I testified on the other trial of this case—voluntarily sat and testified in my own behalf and said that when Mr. Burnaman took his first step, leaving the gate to go back toward his car that I leveled my shotgun on him and held it in a shooting position."

We quote further from the testimony of the appellant: "I did not see him (deceased) do anything with either hand to cause me to believe he was reaching for a pistol in his shirt or in his pocket. It is true that I did not kill him because of any demonstration he made reaching for a gun as he walked back to his car. There was nothing he did as he walked back to the car to cause me to shoot him. I didn't shoot him because he wouldn't stop. If he had stopped I would not have stopped him just the same. As to whether I testified before that I shot him because he wouldn't stop, I will state that I shot him to stop him at the car. If he had stopped and talked to me I wouldn't have shot him. Then because he refused to stop and engage in conversation with me was the reason I shot him."

Appellant also testified in effect that his purpose in asking deceased to stop was to talk to him about their misunderstandings. He thought deceased might attack him and carried his shotgun for protection.

Appellant introduced his wife as a witness, who gave testimony substantially corroborating his version of the killing.

We have not undertaken to set out in detail all of the testimony adduced upon the trial as the statement we have made is

deemed sufficient to elucidate the questions hereinafter discussed.

■ The court gave an instruction covering the law of self-defense, and also charged on provoking the difficulty. It is appellant's contention, as shown in one of his exceptions to the charge of the court and in his brief, that the evidence failed to raise the issue of provoking the difficulty. We doubt if the issue of self-defense was in the case. However, in view of the court's instruction on the subject, we have given careful consideration to the position of appellant that the charge on provoking the difficulty was an unwarranted limitation of his right to defend himself. We have reached the conclusion that Norwood v. State, 135 Tex.Cr.R. 406, 120 S.W.2d 806, and Moore v. State, 96 Tex.Cr.R. 493, 258 S.W. 476, are practically direct authority against the contention of the appellant. In the Norwood case it appears that a quarrel had ensued between the accused and the deceased on a ranch several hours prior to the homicide relative to some goats. Several hours after this difficulty Norwood killed the deceased under circumstances which are summarized in the opinion as follows [135 Tex.Cr.R. 406, 120 S.W.2d 808]:

"We find ourselves unable to agree with him that the issue of provoking the difficulty was not raised by the testimony. There was an unfriendly state of feeling existing between the parties. This seems to have been intensified by what occurred at the ranch a few hours prior to the commission of the homicide. At the time that deceased and his uncle, Orville Word, parked their car in front of the post office in the town of Burnet, appellant was standing on the sidewalk a short distance to the east of where they were parked. His car, with a rifle therein, was parked still further east and down the street. He immediately went to his car and drove it up behind the car of the deceased so that they could not back out. Appellant then got out of his car on the opposite side, reached for his gun, and asked Orville to come to him; that he wanted to see him. Deceased, who saw that his car was blocked and saw appellant's movements, his attitude, and knowing the state of feeling existing, immediately warned his uncle not to comply with appellant's request, because appellant had a gun and would kill him. It seems from the foregoing statement that the deceased had seen appellant with the gun, noticed his movements, and no doubt made an effort to get his gun to protect himself and his uncle from what appeared to be an attack upon them by appellant."

We quote from the Moore case, supra, as follows:

"Appellant and deceased resided upon neighboring farms. They had a quarrel about the location of appellant's fence along the community road which passed his premises. This took place a few weeks before the homicide. There was evidence that the deceased had made hostile declarations and threats to do the appellant violence. Some of these, according to appellant's testimony, were communicated to him, and he also gave evidence of various specific acts of violence upon the part of the deceased against other persons. There were no eyewitnesses save the appellant. According to his testimony, he put his pistol in a scabbard on his person with the view of seeing the deceased some time during the day and discussing with him their differences. Appellant went upon his farm and was doing some work, when he observed the deceased approaching the community road, riding in his wagon. What then happened is thus described by the appellant:

"'When I saw him, I laid my fork down and started to the road in the direction of the post, and he was driving in that direction. I was on my own premises all this time. I went to the corner. He was sitting in a hack on a very small box and driving in an easterly direction. When I got to the post, I asked him why he was telling those damned lies about this road on me, and he said, "I haven't done it," and I told him he had, and started to give an explanation, and he turned to me and says, "You are a God damned liar," and dropped his lines with his right hand and throwed his hand behind him. I was standing with my hand on the post talking with him, and as he did that I pulled my six-shooter up, shooting, and fired three shots.'

"We think the evidence justified the learned trial judge in instructing upon the law of provoking the difficulty as a limitation upon the law of self-defense. Appellant began the conversation with the deceased by the use of language which the jury might have deemed to be reasonably calculated to provoke the deceased and bring on a conflict; and it cannot be said, as a matter of law, that the language and.

conduct of the appellant was not with such an intent."

Having charged on provoking the difficulty, the court instructed the jury as to appellant's right to arm himself and talk to the deceased relative to the difficulties and misunderstandings they had had. Appellant excepted to the charge on the ground that it was too restrictive. The court charged the jury, in substance, that appellant had a right to seek a peaceable interview with the deceased and to arm himself if he had reasonable grounds for belief that the deceased was armed or had available a gun which he might use in killing appellant or doing him serious bodily harm, as viewed from appellant's standpoint at the time. In short, the court charged the jury that appellant had the right to arm himself for protection, and that his action in doing so did not forfeit or impair his right of self-defense. Under appellant's testimony, we are unable to reach the conclusion that the exception to the charge was well taken. Appellant said, in effect, that he believed deceased carried a gun in his car and that he (appellant) armed himself with a shotgun for the purpose of protecting himself in the event deceased attacked him. Whether a charge of the nature in question is too restrictive must depend upon the circumstances of the particular case. Banks v. State, 131 Tex. Cr.R. 196, 97 S.W.2d 219, 222. In the Banks case the following charge was held not to be too restrictive under the facts there shown:

"You are further instructed as a part of the law as set forth in the next two preceding paragraphs of this charge, that the defendant had the right to go to the house of the deceased on the occasion of the homicide for the purpose of seeking an amicable adjustment of their differences relative to the Mose Miller land, or the crops grown thereon for that year; and, if he feared an attack upon him by deceased, he had the right to arm himself before going to deceased's home, for the purpose of protecting himself from any such anticipated attack; and his right of self-defense would not in any manner be cut off or abridged for thus acting."

In Anderson v. State, 86 Tex.Cr.R. 207, 217 S.W. 390, 391, the following charge was held not to be too restrictive under the facts of the case: "You are charged that the defendant had the right, together with his father, F. W. Anderson, to seek the deceased, or to seek Will Smith, or either of them, for the purpose of having an interview with them in regard to any difference that might have arisen between them as to a division of the feed crop raised by Otto Smith on the farm of F. W. Anderson in the year 1918, and also had the right to arm himself against any attacks the deceased, or Will Smith, or Tom Smith might make upon him, or might make upon F. W. Anderson, had he reasonably feared they, or either of them, would make upon him, or F. W. Anderson, while doing so."

Appellant filed a second motion for continuance based in part on the absence of Margaret Tidwell. It was averred in the motion that the witness would testify that Mrs. Jones, a witness for the state, had told her that she went to the car of the deceased shortly after he had been killed and took a gun from said car. This testimony was impeaching in nature, as Mrs. Jones had testified on the trial that she took no gun from deceased's car. We quote from section 324, Branch's Ann. Texas P.C., as follows: "Continuances will rarely be granted to obtain impeaching testimony." The state produced Margaret Tidwell upon the hearing of the motion for new trial. She testified that Mrs. Jones had never told her that she took a gun from the automobile of the deceased. In short, she said that Mrs. Jones had never made any kind or character of statement to her or in her presence with reference to the homicide. It is manifest that the court was warranted, not only in declining to continue the case, but also in overruling the motion for new trial insofar as it was based on the refusal of the application for continuance.

If we understand appellant's exception No. 4 to the charge of the court, it is based upon the failure of the charge to give instructions to the jury covering the provisions of Article 1257a, Vernon's Ann. P.C. of Texas, which reads as follows: "In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be considered by the jury in determining the punishment to be assessed. Provided, however, that in

all convictions under this Act and where the punishment assessed by the Jury does not exceed five years, the Defendant shall have the benefits of the suspended sentence act."

■ This article provides a statutory rule of evidence, and should not be given in charge. Hill v. State, 130 Tex.Cr.R. 585, 95 S.W.2d 106. In Crutchfield v. State, 110 Tex.Cr.R. 420, 10 S.W.2d 119, 122, Judge Lattimore, speaking for the court, used language as follows: "Appellant's bill of exception No. 4 sets out that the court's charge was excepted to for failing to embrace the provisions of article 1257a of the new law of murder (Gen. & Sp. Acts 1927, c. 274), and for not applying said article to the defensive issues presented by the evidence on behalf of the defendant and his witnesses. Article 1257a seems to lay down only a rule as to what evidence may be introduced on the trial of a homicide case, and we are not informed by such exception how such article could be embodied in the charge either for or against the accused."

■ It is the appellant's contention, as evidenced by one of his exceptions to the charge of the court, that he was entitled to an instruction to the jury covering his right to defend his wife, his children, and his property. We find no testimony in the record calling for such an instruction. It was appellant's position, as shown in his testimony, that he believed deceased was going to his car for a gun when he shot deceased. In short, he acted upon the belief that deceased was preparing to kill him when he (appellant) fired the fatal shot. There is no suggestion in the testimony that appellant acted in defense of his wife, his children and his property.

■ Appellant excepted to the charge of the court because of its failure to embrace an instruction covering Article 1223, P.C., which provides in part that when the homicide takes place to prevent murder, and the weapon or means used by the party attempting or committing such murder would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury. It is well settled that the provisions of the article in question should be covered in a proper instruction when called for by the evidence. We quote from Branch's Ann.Texas P.C., Section 1918 as follows:

"Where deceased is about to attack or is advancing on defendant with a deadly weapon, the law presumes that deceased intends to kill and murder defendant, and where deceased is so armed, and his purpose is in any way doubtful, it is reversible error to fail to charge the jury that if deceased was about to advance or was advancing on defendant with a deadly weapon that the law presumes that he intended to kill defendant or do him some serious bodily injury."

■ Many authorities are cited in support of the text, among them being Best v. State, 61 Tex.Cr.R. 551, 135 S.W. 581, 582. It is also the holding of the court that there is "no occasion to charge upon the presumption from the use of a deadly weapon by deceased if there is no evidence that deceased used a weapon in the assault made by him." Branch's Ann. Texas P.C., § 1918; Bryant v. State, Tex. Cr.App., 47 S.W. 373, 374; Spencer v. State, 59 Tex.Cr.R. 217, 128 S.W. 118, 121. In the same section Mr. Branch makes the following statement: "Where the defense is based only on the theory of apparent danger and there is no evidence that deceased was armed, the court should not charge on the presumption from the use of a weapon by deceased. Andrews v. State [Tex.Cr.App.], 76 S.W. [918], 919." Looking to the testimony, it is observed that witnesses for the state who came to the scene of the homicide shortly after deceased had been killed affirmed that there was no gun in the car of the deceased and that the only weapon on his person was a pocket knife. Appellant made no claim in his testimony that deceased had any weapon in his possession at the time he shot him. In short it was appellant's version that deceased had no gun or other weapon in his hand at the time the fatal shot was fired. However, appellant testified that the deceased customarily carried a rifle in his car, and that when deceased went toward his car after being commanded to stop he believed deceased was seeking his gun. Appellant's wife testified that Mrs. Jones, a witness for the state, was at the scene of the homicide shortly after it occurred, and that she removed something from the car of the deceased. Whatever Mrs. Jones took from the car—and she denied that she took anything—was not shown in the testimony of the wife of the appellant to be a gun or any other weapon. In short, there was no testimony showing

that the deceased was armed. In Starland v. State, 116 Tex.Cr.R. 423, 32 S.W.2d 657, 658, this court said:

"Appellant objected to the charge of the court on the ground that it did not contain an instruction on the presumption arising from the use of a deadly weapon, by deceased, under article 1223, P.C. The facts did not call for the charge. Appellant does not claim to have seen a pistol or any other weapon in the possession of deceased. He only said that he thought deceased was going to attack him when he placed his hand in his pocket. Appellant's own witnesses, as well as the witnesses for the state, testified that deceased was unarmed. Lawrence v. State, 112 Tex.Cr.R. 659, 18 S.W.2d 181; Davis v. State, 107 Tex.Cr.R. 357, 296 S.W. 596; Yancy v. State, 108 Tex.Cr.R. 39, 298 S.W. 908."

Under the circumstances reflected by the record, the court was not in error in failing to amend the charge in response to the exception in question.

Appellant introduced witnesses who gave testimony to the effect that appellant's general reputation as a peaceable and law-abiding citizen was good. There appears to have been no contest on this issue. The charge of the court discloses that appellant's application for a suspended sentence was properly submitted to the jury. No reference was made in the charge to the proof of the good reputation of the appellant in the respect mentioned. Appellant excepted to the charge, as follows: "Defendant objects and excepts to the entire charge because the Court fails to instruct the jury that they may take into consideration the testimony of the witnesses with reference to their reputation of the defendant as to being a peaceable, law-abiding citizen, not only on the question of suspended sentence, but on the question of his probable guilt."

In support of his contention that the court fell into error in failing to amend the charge in response to the exception, appellant cites Johnson v. State, 138 Tex.Cr.R. 188, 135 S.W.2d 485, 487, in which this court said: "The proposition that a defendant in the trial of a criminal case may show his good general reputation in the community in which he lives is not one open for discussion. It is a matter properly to be considered by a jury, either in determining the guilt of the defendant or in fixing the penalty appropriate to his case." The question before the court in Johnson's case was not concerned with the refusal of the trial court to single out and charge upon the effect of testimony relative to the good general reputation of the accused as a peaceable and law-abiding citizen, but involved only the action of the trial court in refusing to permit a witness to testify that the reputation of the accused in the respect mentioned was good. We held such testimony admissible, and reached the conclusion that the error in excluding it was reversible. It is thus seen that the announcement in the Johnson case is not applicable to the present situation. While the accused may introduce evidence touching his good general reputation in reference to the nature of the charge against him, a charge would be upon the weight of evidence which instructed the jury as to the consideration or weight to be given such evidence. Lockhart v. State, 3 Tex.App. 567. In Pharr v. State, 9 Tex.App. 129, the court said: "It was not incumbent on the judge to give a special instruction on good character. The law permits one accused of crime to put his previous good character before the jury for their consideration. All the court is required to do is to permit the evidence to go to the jury, to be by them considered in connection with the other testimony in the case, in order to determine from the whole evidence the guilt or innocence of the accused." The exception was properly overruled. 24 Tex.Jur., 571; McDaniel v. State, 63 Tex.Cr.R. 359, 139 S.W. 1154.

A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

On Motion for Rehearing.

BEAUCHAMP, Judge.

Appellant's motion for rehearing in this case attacks the opinion of the court as being contrary to law and not borne out by the record. We have carefully examined his several points on the subject and, believing that the record sustains the original opinion, it is our conclusion that it is now the law, since this opinion so decrees.

We have reconsidered all the questions raised in the motion for rehearing and it is our belief that the original opinion properly considers and sufficiently discusses each question which the motion for rehearing recalls. The opinion cites authorities and discusses them in sustaining the conclusion which was reached. It is observed that appellant has not undertaken to discuss these authorities or point out others to the contrary in his motion. A further discussion by this court does not appear to be called for and we refrain from doing so.

The motion for rehearing is overruled.