**James Dilliard SHAW, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 47886.**

Court of Criminal Appeals of Texas.

March 20, 1974.

Rehearing Granted June 12, 1974.

Rehearing Denied July 10, 1974.

Leo A. Kissner, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough, Stu Stewart, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., and Buddy Stevens, Asst. State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is murder without malice; the punishment, five years.

In his sole ground of error, appellant complains of the failure of the trial court to give a requested charge that the jury find the appellant not guilty if they found that at the time appellant killed the deceased the deceased was taken in an act of adultery with the wife of the appellant and before the deceased and appellant's wife had separated.

Appellant maintains that the evidence raised the defense of justifiable homicide under Article 1220, Vernon's Ann.P.C.,[1] necessitating an appropriate charge.

The trial court made a determination prior to the start of the trial in this case that on August 20, 1971, the date of the offense, the appellant and Brenda Olbrych were common law husband and wife.

Brenda Olbrych testified that, following her divorce from Robert Olbrych in March of 1971, she and appellant had begun living together. Before Brenda Olbrych's marriage to Robert Olbrych, she and appellant had been married for some five years before a divorce in October of 1968. Appellant and Brenda cohabitated from March 1971 until May 1971, when they separated for a time. It was at this point in time, during which the court had determined that a common law marriage existed, that Brenda began seeing Eugene Hintz, the deceased, who was a long time friend of appellant. Appellant testified that he was aware of the relationship between his wife and Hintz for some time and had asked Hintz to stop seeing his wife.

On the night in question, Brenda testified that appellant telephoned her at her apartment twice, saying that he wanted to talk to her. She admitted to appellant that Hintz was with her and refused to talk to appellant. Subsequently, appellant went to Brenda's apartment and shouted for Brenda to come outside so that he could talk to her. Although the door remained closed, appellant continued for some ten to fifteen minutes to urge Brenda to come and talk to him, which she refused to do. Brenda testified that it then appeared that appellant had gone, but some five minutes later he again began shouting at Brenda and kicked open the apartment door. Hintz was standing at the kitchen table fully dressed holding a knife. Brenda testified that earlier in the evening she and Hintz had engaged in sexual intercourse, but there was no testimony that they had been

---

[1] "Homicide is justifiable when committed by the husband upon one taken in the act of adultery with the wife, provided the killing take place before the parties to the act have separated. Such circumstance cannot justify a homicide where it appears that there has been, on the part of the husband, any con-nivance in or assent to the adulterous connection."

We note that Article 1220, supra, was repealed by the Legislature and would no longer provide a defense under the new Penal Code, effective January 1, 1974.

engaged in sexual intercourse immediately preceding the events here described.

We quote a portion of the testimony:

"A [Appellant] I went upstairs and I knocked on the door again and I said, 'Brenda, I just want to talk to you, come out here and talk to me, please?

Q [Defense Counsel] Brenda was standing by the door?

A Yes sir.

Q You kicked the door and it opened is that right?

A Yes sir.

. . . . . .

Q Now at that time when you opened the door and you were standing there, what happened?

A Well, I walked in and I told her, 'I just want to talk to you', and she didn't say anything, she just looked over my shoulder.

Q Over this way?

A Yes sir.

Q Okay, and then what happened?

A When she looked, she was trying to divert my attention away, and then I turned around, and when I turned around I saw Gene.

Q Where was he standing?

A Gene———his exact position I don't know, he was between the table and the wall.

. . . . . .

Q So when you looked over there you saw Gene standing there?

A Yes sir.

Q Did he shout anything?

A Well, I turned and I saw him, and I saw a knife; I didn't see his face, I just saw a knife.

Q What kind of knife?

A It was a long knife; it looked like a carving knife, a butcher knife, it was a long knife.

. . . . . .

Q But you didn't see his face?

A No sir.

Q Did you know it was him?

A When I turned I got a glimpse of his entire body, but my eyes focused on his knife, I looked at the knife more than anything; I have tried to think before of the expression on his face, but I didn't see it.

Q When you turned and saw that knife, did you have that knife in your hand then?

A No sir.

Q Now, when you saw him with that knife were you scared?

A Yes sir, because he wasn't standing still, he was moving toward me, but it wasn't a fast move, it was a slow move. He wasn't running towards me or anything, it was just like he was coming out of the kitchen.

Q This way?

A Yes sir.

Q Were you in fear of your life at that time?

A Yes sir.

Q What did you do?

A Well, I told you that the first time I came over there I put that knife in the small of my back and I had the shirt over it, and when I saw him, I turned and saw him and it all happened so fast, he was just moving, but he was not moving fast, he was moving toward me, and when I turned and I saw him I saw the knife, and I went for mine, and I pulled my knife and he was right on me."

The court charged on self defense, and the jury rejected this theory of defense by their verdict.

The evidence does not reflect that the deceased was in fact "taken in the act of adultery" so as to raise the defense of justifiable homicide. There is no error shown in refusing the requested charge. See McFarland v. State, 149 Tex.Cr.R. 516, 196 S.W.2d 829; Halbert v. State, 138 Tex. Cr.R. 592, 137 S.W.2d 1010; Ryan v. State, 122 Tex.Cr.R. 464, 55 S.W.2d 829; Stillwell v. State, 104 Tex.Cr.R. 338, 283 S.W. 840.

The judgment is affirmed.

### OPINION

## ON APPELLANT'S MOTION FOR REHEARING

ROBERTS, Judge.

■ Appellant takes issue with that portion of our original opinion which stated that the evidence in this case did reflect that the deceased was taken in the act of adultery, and that therefore the issue of justifiable homicide was not raised. He contends that the issue was raised and that he was entitled to his requested charge on the subject under the paramour statute, Art. 1220, Vernon's Ann.P.C. We agree.

The record reveals the following:

"Q Okay, now, we get off the phone and what happened?

"A We talked some more, about Gene and I and about Gene's family and about him and about him and his father and things like that, and in a little while Gene got up and said, 'I am going in the kitchen to get some water', and I said, 'Okay' and when he went in the kitchen I looked out the bedroom window and I had no reason to look out the bedroom window, but I saw Buddy [appellant] driving up, and all Gene had on was his undershorts, and I ran in there and said, 'Gene hurry up and get dressed because Buddy is out there', and I kept telling him to hurry, and so he went back in the bedroom and put his clothes on and he came back in the kitchen, and then I went back in the bedroom to look out the window again, to see if I could see where Buddy was parked and I couldn't so I thought he drove on, and I ran back in the kitchen and I said, 'Don't worry, he didn't stop', and he said, 'Yes he did, he is standing right down at the stairs hollering for you', and I said, 'What is he saying?', and Gene said he was saying for me to come down, and then I started listening and he was calling, 'Brenda, come downstairs, I want to talk to you.' "

Brenda Shaw also testified that she and Hintz had just engaged in sexual intercourse, prior to the appellant's arrival.

Appellant's testimony, in part, is as follows:

"A Yes sir, I got to wondering whether she was just lying to me again and whether she loved me or what, and I just wanted to talk to her, things just didn't sound right when I called and I just wanted to talk to her.

"Q You called her again?

"A Yes sir, I called her up and asked her to talk to me, and she said she couldn't talk to me right then that she would talk to me tomorrow, and I told her, 'I want to talk to you', and she said, 'I can't talk to you right now'.

"Q Did you get loud and boisterous at that time?

"A No sir.

"Q Did you at that time say anything about killing Gene Hintz?

"A No sir.

"Q You didn't make any mention about it?

"A No sir.

"Q What did you do then?

"A I finished eating, and I decided to go over there and see if he was going to spend the night there; she had promised me that she would not let him spend the night over there; so I went over there, and I drove by the apartment, and I stopped and I parked out front, and in my tool box I kept my hunting knife that my grandfather had given me, and I put the knife in the small of my back and put my shirt over it and I walked by the apartment and the lights were on so I didn't go in.

"Q The lights were on?

"A Yes sir.

"Q What happened then?

"A I went back to the car and over to the place where I had seen her previously that day and shot a game of pool and waited a while, and I wanted to talk to her, and then I went back by the apartment.

"Q Were the lights on or off?

"A The lights were off when I got there; I drove in the same way, through the back, underneath the apartment, and drove around and parked out front, where that circle drive would be, on the other side, and I walked back to the apartment, and the lights were off, and I hollered at Brenda, 'Come talk to me', 'Come down and talk to me', I wanted to talk to her.

\* \* \* \* \* \*

"Q Why did you go there if you were scared of him and you knew he was there?

"A I wanted to talk to my wife; I didn't want him spending the night there with my son in that bedroom."

Upon cross-examination by the State, appellant related:

"Q And your intent was to come back and talk?

"A Yes sir.

"Q The lights were off this time, why didn't you go home and call tomorrow?

"A Well, I noticed that Gene's car was still there.

"Q Well, you just got through saying you didn't want to go up and talk while he was there?

"A *There would only be one reason for the lights to be out, and that is that they would be in bed.*

"Q And that is what you thought?

"A Yes sir.

"Q Did you think that that was a good time to talk about it?

"A Well, that was the whole thing though, that I didn't want Gene spending the night with Brenda.

"Q Isn't it a fact that you went up there and you saw the lights out and you thought about going up and killing somebody?

"A No sir."

(Emphasis added)

The question was raised as early as 1885 as to whether, in order to come within the paramour statute, "the husband must discover, find, or see the wife and adulterer in the very act of illicit intercourse or copulation in order to constitute the offense denominated 'taken in the act of adultery?'" Price v. State, 18 Tex.App. 474 (1885). The court reasoned well there and stated:

"Such positive proofs of the commission of the crime of adultery are not required, and are rarely attainable. As a crime, adultery itself may be established

and proven by circumstantial testimony. Should the law hold the husband to a greater or higher degree of proof than itself requires to establish a given fact? It is a late hour of the night,—the parties are found in a corn crib some distance from the house, lying down in the dark. They refuse, at first, to answer when called, then, when the wife answers, she denies that any one is with her,—when deceased gets up he clutches the gun,—defendant finds that the one whose previous conduct and 'carrying on' with his wife has excited his suspicions is the one he has thus found in company with his wife. What would any reasonable, sensible man have concluded from these circumstances? *In other words, how did the matter reasonably appear to defendant?* To him are not these facts 'confirmations strong as proofs of holy writ?' Could it have been otherwise than that he had caught the parties in the act of adultery, either just as they were about to commit, or just after they had in fact committed it? \* \* \* Does not the law always estimate a man's right to act upon *reasonable appearances?* Taking into consideration the res gestae,—taking the acts of the parties and their words coupled with their acts,—and were not the appearances of a character such as would have created the reasonable apprehension and conviction, in a person of ordinary mind, that the parties thus taken were taken in the act of adultery?" (Citation omitted; emphasis added)

See also Gregory v. State, 50 Tex.Cr.R. 73, 94 S.W. 1041 (Tex.Cr.App.1906).

■ Admittedly, in the present case, if this were a question of the sufficiency of the evidence as to whether the homicide was justified, it would present a very close question. However, the appellant had the right to have the *jury* determine that issue. This Court has said so many times that whenever evidence is presented, no matter how slight or from what source, which raises an affirmative defense, the accused is entitled to have that charge presented to the jury.

The present appellant has done that. The appellant's motion for rehearing is granted; the judgment is reversed and the cause remanded.

MORRISON, Judge (dissenting).

The original opinion quoted that portion of appellant's testimony in which he discussed the killing and gave his reason therefor. He testified that he acted in self defense and justified the killing on this ground alone. Such defense was submitted to the jury.

The majority now says in effect that if there was another defense upon which appellant might have relied and did not, it too should have been given in the court's charge to the jury.

For this Court to reverse in such a case is essentially unfair to the trial judge who presided and who gave the defensive charge which was raised by the testimony and denied that which was not.

In Rice v. State, 156 Tex.Cr.R. 366, 242 S.W.2d 394, we said, "Appellant having testified, he made his own defensive theory and is bound thereby." See also Boyd v. State, 128 Tex.Cr.R. 539, 83 S.W.2d 326; Jamison v. State, 141 Tex.Cr.R. 349, 148 S.W.2d 405; Howard v. State, 172 Tex. Cr.R. 352, 357 S.W.2d 403; Whitehead v. State, Tex.Cr.App., 450 S.W.2d 72; and Sias v. State, Tex.Cr.App., 495 S.W.2d 890.

Since the only defense relied upon by appellant was submitted to the jury, and because I am thoroughly convinced that this cause was properly decided on the issues raised by the evidence, I must vigorously dissent to the reversal.

DOUGLAS, J., joins in this dissent.